IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

CONNIE L. CURRY,      )
    Plaintiff,     )
           )
    v.       )  Civil No. 3:15cv85 (REP)
           )
CAROLYN W. COLVIN,     )
Acting Commissioner of Social Security, )
    Defendant.    )
_____ )

## REPORT AND RECOMMENDATION

Connie L. Curry ("Plaintiff") is fifty-three years old and previously worked as an administrative assistant. On June 18, 2012, Plaintiff applied for Social Security Disability Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff claimed to be suffering from a variety of disabling maladies, including frozen shoulder syndrome and fibromyalgia, with an alleged onset date of December 20, 2011. Plaintiff's claim was denied initially and upon reconsideration. On August 26, 2014, Plaintiff, represented by counsel, appeared before an Administrative Law Judge ("ALJ"). On September 26, 2014, the ALJ found that Plaintiff was not disabled. On December 10, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner of Social Security.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g), asserting that the ALJ erred in failing to afford Plaintiff's treating physician's testimony controlling weight and in failing to properly assess Plaintiff's credibility and residual functional capacity ("RFC"). The parties have submitted cross-motions for summary judgment, which are

now ripe for review. Having reviewed the parties' submissions and the record[1] of this case, the Court is prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED; that Plaintiff's Motion for Remand (ECF No. 10) be DENIED; that Defendant's Motion for Summary Judgment (EFC No. 12) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff alleges that the ALJ erred in failing to afford Plaintiff's treating physician's medical opinion controlling weight and in assessing Plaintiff's credibility and RFC, Plaintiff's work history, medical history and relevant hearing testimony are summarized below.

### A. Education and Work History

Plaintiff was fifty-one years old when she filed for DIB and SSI. (R. at 42). Plaintiff completed high school. (R. at 45.) She had worked as an administrative assistant in a chemical laboratory for thirteen years. (R. at 46.)

### B. Medical Records

#### 1. Richard Livingston, M.D.

On October 17, 2011, Plaintiff visited Dr. Livingston, complaining of shoulder pain. (R. at 459.) During that visit, Plaintiff rated her pain as a seven out of ten (with ten being the most severe). (R. at 460.) Plaintiff also stated that "nothing" helped to decrease the pain that she felt in her shoulder. (R. at 460.) Dr. Livingston diagnosed Plaintiff with a left shoulder

---

[1]     The administrative record in this case has been filed under seal pursuant to E.D. Va. Loc. R. 5 and 7(C)(1). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers, such as Plaintiff's Social Security number, the names of any minor children, dates of birth (except for year of birth) and any financial account numbers contained in the record, from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

impingement, but noted no tenderness in the affected area. (R. at 459-60.) Dr. Livingston referred Plaintiff for physical therapy. (R. at 462-64.) Plaintiff only attended an initial evaluation session for physical therapy. (R. at 467.) Dr. Livingston prescribed steroid injections to combat Plaintiff's alleged increase in shoulder pain and ordered an MRI to better evaluate the shoulder structure. (R. at 467, 851.) The December 12, 2011 MRI indicated lateral arch stenosis with "impingement related changes" in the nearby humeral head. (R. at 852.) The MRI also indicated mild tendinopathy of the supraspinus, although it revealed no tear in the shoulder structure. (R. at 852.)

On June 27, 2012, after a long hiatus, Plaintiff again visited Dr. Livingston. (R. at 791.) Plaintiff complained of muscle pain, joint pain and swelling of her hands and ankles. (R. at 791.) Dr. Livingston diagnosed myalgia/myositis, diabetes mellitus, edema, frozen shoulder syndrome and left shoulder impingement. (R. at 792.)

### 2.  David Minter, M.D.

On December 15, 2011, Plaintiff visited Dr. Minter and reported a year-long history of "progressively worsening" left shoulder pain. (R. at 929.) Dr. Minter determined that Plaintiff suffered from frozen shoulder syndrome and bursitis. (R. at 929.) An x-ray also showed acromial spurring, which is typically caused by stress or misalignment of the shoulder joint. (R. at 929.) Dr. Minter scheduled left shoulder manipulation and decompression, and performed the operation on December 20, 2011. (R. at 530, 929.) During the procedure, Dr. Minter noted "significant" bursitis and a low grade ligament abrasion. (R. at 530.) Dr. Minter rectified these conditions, along with the scheduled repairs. (R. at 530.)

Plaintiff made good progress after the operation in her attempt to return to normal functionality. (R. at 448-58.) However, on February 15, 2012, Plaintiff returned to Dr. Minter

3

with a recurrent case of frozen shoulder. (R. at 924.) On February 27, 2012, Dr. Minter performed additional surgery and noted immediate and marked improvement in Plaintiff's range of motion. (R. at 499.)

After this second procedure, Plaintiff reported marginal improvement. (R. at 543-88.) Plaintiff reported severe to moderate pain during her course of physical therapy and exhibited difficulty stretching her shoulder. (R. at 545-88.) Plaintiff also missed a number of physical therapy sessions for a variety of reasons, some of which were unrelated to her condition. (R. at 542, 561.) Contrary to Plaintiff's reports, Dr. Minter noted that Plaintiff made "okay" progress in improving her shoulder mobility and function. (R. at 919-20.)

On May 18, 2012, Dr. Minter completed an impairment questionnaire for Plaintiff. (R. at 730-35.) Dr. Minter opined that Plaintiff could occasionally lift and carry five pounds at a time, was "essentially precluded" from grasping and turning objects, was "essentially precluded" from reaching overhead and could not push or pull significant loads. (R. at 732, 734.) Dr. Minter noted that Plaintiff's condition was unlikely to last twelve months, and Plaintiff could still use a computer. (R. at 733-34.) Plaintiff also had no limitations on her right arm and could use both hands for fine manipulations. (R. at 734.)

On May 30, 2012, Plaintiff again visited Dr. Minter, complaining of a limited range of motion and pain in both shoulders. (R. at 918.) Dr. Minter noted improvement in range of motion despite the complaints. (R. at 918.) During a follow-up appointment six weeks later, Plaintiff exhibited a better range of motion in her shoulder, but complained of full-body aches. (R. at 917.) In response, Dr. Minter suggested that she follow-up with her thyroid specialist and visit a pain management specialist. (R. at 917.) On August 10, 2012, Dr. Minter noted that

Plaintiff had neglected to visit a pain management specialist, and no evidence appears in the record to suggest that Plaintiff ever visited a pain management specialist. (R. at 973.)

### 3. Andrew Rose, M.D.

On October 9, 2012, Plaintiff presented to Dr. Rose for an initial evaluation. (R. at 1113-17.) Plaintiff appeared well during the physical examination and in no acute distress. (R. at 1114.) Significantly, Dr. Rose noted no edema in Plaintiff's extremities, nor did he note any musculoskeletal tenderness or loss of strength. (R. at 1115-16.) Dr. Rose prescribed Lortab for Plaintiff's fibromyalgia and frozen shoulder. (R. at 1116.) During a later visit, Plaintiff noted that her medication regimen was insufficient as she routinely awoke with migraine headaches. (R. at 1130.) Despite this, Dr. Rose did not alter her medication regimen. (R. at 1130-32.)

On April 4, 2013, Plaintiff again returned to Dr. Rose. (R. at 1163.) Plaintiff reported that her medication regimen was effective, yet she requested Dr. Rose to complete Social Security disability paperwork. (R. at 1163-66.) Dr. Rose noted that Plaintiff's chief medical conditions were well-managed and that she could return for a follow-up appointment in six months. (R. at 1164-65, 1174.)

On August 20, 2013, Dr. Rose completed a Multiple Impairment Questionnaire. (R. at 1197-1204.) While Dr. Rose diagnosed fibromyalgia, diabetes mellitus, hypertension and a history of thyroid cancer, he stated that Plaintiff's prognosis was "good" with respect to these conditions. (R. at 1197.) According to Dr. Rose, Plaintiff's primary symptom was chronic diffuse joint pain. (R. at 1198-99.) Dr. Rose stated that these conditions were not fully treatable without unacceptable side effects. (R. at 1199.) Dr. Rose listed "life" as the precipitating factor for Plaintiff's condition. (R. at 1199.) Dr. Rose rated Plaintiff's pain at a seven and her fatigue at an eight, both from a ten-point scale. (R. at 1199.) According to the questionnaire, Plaintiff

could sit for one hour, stand and/or walk for less than that time, and could not sit or stand continuously during an eight-hour workday. (R. at 1199-1200.) Dr. Rose further opined that Plaintiff could not lift or carry any weight during the workday, nor could she engage in repetitive reaching, handling or fingering without aggravating her symptoms further. (R. at 1200-1201.) Plaintiff could not push, pull, kneel, bend or stoop. (R. at 1203.)

Dr. Rose stated that Plaintiff's symptoms were severe enough to interfere with her concentration and had a detrimental effect upon her emotional well-being. (R. at 1202.) In turn, her emotional state negatively affected her symptoms further. (R. at 1202.) Plaintiff was unable to tolerate even "low stress" work. (R. at 1202.) Plaintiff's symptoms were inconsistent in their severity and she experienced "good days" and "bad days." (R. at 1203.) Dr. Rose did not consider Plaintiff a malingerer. (R. at 1202.) Due to her symptoms, Plaintiff was likely to be absent from work more than four times per month. (R. at 1203.)

On October 1, 2013, Plaintiff's condition further worsened, and she complained to Dr. Rose of increased shoulder pain and decreased range of motion. (R. at 1244.) Dr. Rose referred Plaintiff for physical therapy. (R. at 1245.)

On January 7, 2014, Plaintiff complained of increased distress due to her fibromyalgia. (R. at 1253.) Dr. Rose prescribed a larger dose of Lortab and a regimen of Lyrica. (R. at 1253.)

On August 14, 2014, Dr. Rose diagnosed Plaintiff with pedal edema and prescribed a diuretic to remedy the problem. (R. at 1265.) On that same day, Dr. Rose concluded on a fibromyalgia questionnaire that Plaintiff met criteria for a diagnosis of fibromyalgia as established by the American College of Rheumatology. (R. at 1207.) In his report, Dr. Rose acknowledged at least eleven tender points that Plaintiff displayed during her physical exam. (R. at 1208.) In addition to the fibromyalgia diagnosis, Dr. Rose stated that Plaintiff's symptoms

6

were aggravated by co-occurring fatigue, insomnia, constipation, depression, nervousness, headaches, heartburn, lost appetite and muscle weakness. (R. at 1208.) He stated that these limitations manifested on December 1, 2011. (R. at 1211.)

Dr. Rose stated that Plaintiff was unable to sit or stand/walk for over an hour in an eight-hour workday and that it was "medically necessary" for Plaintiff to avoid sitting continuously. (R. at 1209.) Plaintiff could rarely, if ever, lift or carry any weight and had significant limitations reaching, handling or fingering. (R. at 1209.) Plaintiff's medications caused edema and fatigue, and substituted medications did not relieve those side effects. (R. at 1210.) According to Dr. Rose, Plaintiff was compliant with treatment regimens. (R. at 1210.)

Dr. Rose opined that Plaintiff's condition was also likely to interfere with her employment, as she had difficulty concentrating and was likely to be absent from work more than three times per month. (R. at 1211.) Entering a competitive work environment would exacerbate her symptoms. (R. at 1211.)

4. Onyeije Ozurumba, M.D.

On February 1, 2013, Plaintiff saw Dr. Ozurumba and complained of whole-body pain. A physical examination revealed only slight tenderness in extremities and joints. (R. at 1145-46.) Plaintiff displayed normal strength, no sensory deficit, normal mood and no distress. (R. at 1145-46.) Dr. Ozurumba prescribed new medication and instructed Plaintiff to return only if her symptoms failed to improve or worsened. Plaintiff did not return to Dr. Ozurumba, but did report to Dr. Rose that her fibromyalgia was improving on the new medications. (R. at 1154.)

5. Melissa Clayton, N.P.

On July 2, 2013, Nurse Clayton performed Plaintiff's annual physical exam. (R. at 1153.) During the examination, Plaintiff reported feeling generally well with no unusual or new musculoskeletal symptoms. (R. at 1185.)

6. State Agency Physicians

On January 17, 2013, James Wickham, M.D. evaluated Plaintiff's medical record. (R. at 84-85.) Dr. Wickham determined that Plaintiff had exertional and postural limitations. (R. at 86-88.) Plaintiff could lift twenty pounds occasionally and ten pounds frequently. (R. at 87.) Furthermore, she could only sit or stand for a total of six hours in an eight-hour workday. (R. at 87.) Plaintiff could only occasionally climb ladders, ropes, and/or scaffolds because of her limited use of her left shoulder. (R. at 87.) Plaintiff could climb ramps/stairs, balance, stoop, kneel, crouch and crawl with unlimited frequency. (R. at 87.) Plaintiff's only physical limitations were related to her left shoulder. (R. at 88.) For this reason, Dr. Wickham opined that Plaintiff should be limited to light work and determined that Plaintiff was not disabled. (R. at 89.)

The following April, Rajeschwar Kadian, M.D. reviewed Dr. Wickham's findings. (R. at 111-112.) Dr. Kadian affirmed Dr. Wickham's opinion. (R. at 117.) Significantly, Dr. Kadian also wrote that Plaintiff's assertions regarding the severity, persistence and limiting effects of her symptoms were not entirely credible. (R. at 114.) Dr. Kadian determined that Plaintiff's impairments were severe, but did not prevent her from performing any work at all. (R. at 114.)

C. Function Reports

On "September 31, 2012," [sic] Plaintiff filled out a function report. (R. 307-14.) Plaintiff lived in a house with her family. (R. at 307.) She had to take her pain medications as

8

soon as she woke up in the morning so she could function throughout the day. (R. at 307.) She could dress herself and could accomplish light household chores. (R. at 307.) She cooked if the equipment and necessary labor were light. (R. at 307.) It typically took her around one hour to cook for herself. (R. at 309.) She could drive herself to medical appointments and sustain functionality without pain medications during the appointments if they were nearby. (R. at 307.) She could grocery shop on her own, but required the assistance of another if the groceries weighed too much. (R. at 307.) The shopping trips took up to four hours if her husband or children accompanied her. (R. at 310.) She did not have any trouble performing any of the previously mentioned tasks until the onset of her alleged conditions. (R. at 308.)

Her conditions affected her sleep. (R. at 308.) She could not dress, bathe or shave without difficulty. (R. at 308.) She had no difficulty feeding herself or using the toilet. (R. at 308.) She could do light housework, such as vacuuming or making beds, and could do one load of laundry per day. (R. at 309.) She could pay bills, count change, handle a savings account, use a checkbook and fill out a money order. (R. at 310.)

Plaintiff watched TV and cooked on a daily basis, although she could not cook with heavy culinary instruments. (R. at 311.) While Plaintiff mainly stayed at home, she occasionally visited relatives. (R. at 311.) Plaintiff also talked on the phone with friends or relatives. (R. at 311.) She stated that she had no problems getting along with friends, family, neighbors or others. (R. at 312.)

Plaintiff stated that the alleged condition affected her ability to lift, squat, reach, bend, stand, walk, sit, kneel and climb stairs. (R. at 312.) She could only walk one quarter-mile before she needed to rest for up to ten minutes. (R. at 312.) She finished what she started, and had no problems following written or spoken instructions. (R. at 312.) She was never fired from a job

because of an inability to get along with others, and she got along with authority figures without issue. (R. at 313.) She did not handle stress or changes in routine very well. (R. at 313.) She required glasses to see. (R. at 313.)

On April 15, 2013, Plaintiff filled out a second function report. (R. at 333-340.) While this function report is substantially similar to the previous one, there are a number of areas in which Plaintiff's condition appear to have improved. Plaintiff walked family pets for exercise. (R. at 334.) She learned new ways to dress herself to cope with her allegedly limited mobility. (R. at 334.) She crocheted as a hobby. (R. at 337.) She volunteered at the local school. (R. at 337.) The only negative developments between the two function questionnaires consisted of more fatigue and a need for a longer rest after walking a long distance. (R. at 338.) She remarked that she could function in this manner because of her pain medication regimen. (R. at 340.)

D. Plaintiff's Testimony

On August 6, 2014, Plaintiff, represented by counsel, testified during a hearing in front of the ALJ. She testified that she had worked as an administrative assistant at a laboratory before the onset of her alleged condition. (R. at 46.) She could function normally and carry a full case of copy paper, although she was not sure exactly how much the paper weighed. (R. at 47.) Plaintiff testified that she experienced constant pain in her shoulders, back, hips and knees. (R. at 47.) She claimed to experience "severe" pain about three to four times per week. (R. at 47.) She was fully dependent on her pain medications and took them up to four times per day. (R. at 48.) The medication reduced her pain from a seven or eight to about a four out of ten. (R. at 49.)

Her medications caused side effects such as edema or fatigue. (R. at 50.) To reduce these side effects, Plaintiff occasionally avoided taking medication and lied down in a prone

10

position to ease the pain. (R. at 50.) She could sit for half an hour and then she had to stand. (R. at 51.) She could stand for half an hour, and then she had to sit. (R. at 51.) She alternated these activities to manage her discomfort. (R. at 51.) She could walk half a block without rest and could lift one to two pounds comfortably. (R. at 51.) She could dress herself, but required supervision to shower, because she almost fell in the tub on one occasion. (R. at 52.) She cooked "very little," but on a daily basis for the family. (R. at 52-53.) She could perform light housework, such as dusting, sweeping, laundry, making a bed, doing limited amounts of dishes and watering plants. (R. at 53-55.) She could not perform any chore that required her to stoop, crouch or kneel. (R. at 64.)

Plaintiff could drive a car to her medical appointments and to the grocery store. (R. at 56.) She watched TV for around four to five hours per day. (R. at 56.) She crocheted an hour or two per day. (R. at 57.) Despite this, Plaintiff contended that she had difficulty using her hands and fingers, and that crocheting for an extended period of time hurt her hands. (R. at 58.) She also testified that due to weakness in her hands, she often dropped objects that she was holding — around once per day. (R. at 67-68.)

Plaintiff rarely left the house for social reasons. (R. at 58-59.) If she went out to visit family, she only did so with her husband who drove. (R. at 58-59.) She rarely shopped, except for groceries, and required a companion to carry heavier items. (R. at 59, 65.) She was not a member of any clubs or organizations. (R. at 59.) Plaintiff used to volunteer at her children's school to teach crochet. (R. at 61.) However, due to her inability to concentrate and the stress of managing a roomful of children, Plaintiff ceased volunteering. (R. at 61-62.)

On an average day, Plaintiff woke up and prepared a pot of coffee. (R. at 60.) Plaintiff then took her pain medications and waited for them to take effect, accomplishing little in the

11

interim.  (R. at 60.)  She took her dogs for a short walk and talked to her kids.  (R. at 60.)  She

watched TV or napped.  (R. at 60-61.)  She had to elevate her feet for an hour per day to alleviate

swelling, and usually did this in the afternoon.  (R. at 67.)  She could prepare simple meals for

herself, such as sandwiches.  (R. at 61.)  Plaintiff testified that she used to be able to cook large

and elaborate meals before the onset of her alleged disability.  (R. at 63.)

     E.  Vocational Expert Testimony

     During the hearing, the ALJ posed a number of hypothetical questions to an impartial

vocational expert ("VE").  (R. at 68-69.)  The VE testified that Plaintiff's original and former

work fell under the "secretary" classification in the Dictionary of Occupational Titles ("DOT").

(R. at 69.)  The DOT defined the position as sedentary.  (R. at 69.)  In practice, Plaintiff's work

entailed lifting up to fifty pounds, which indicated a medium exertional level.  (R. at 69.)

     The ALJ asked the VE to consider an individual of Plaintiff's age, educational

background, prior work experience and functional limitations.  (R. at 69-70.)  These functional

limitations included the inability to:  sit for more than thirty minutes; stand for more than thirty

minutes; walk over half a block; and lift over two pounds.  (R. at 69-70.)  Furthermore, the ALJ

instructed the VE to assume that the hypothetical individual must lie down multiple times during

the workweek for stretches of three to four hours.  (R. at 70.)  The individual also needed to

elevate her legs to chest level for an hour during the workday.  (R. at 70.)  In addition, the

individual could repetitively use her hands for grasping and handling, although not constantly.

(R. at 70.)

     Based upon these conditions, the VE testified that the hypothetical individual would not

be able to perform any of Plaintiff's prior work.  (R. at 70.)  Moreover, the VE testified that the

individual would be able to find no other work in either the local or national economy. (R. at 70-71.)

In the next hypothetical question, the ALJ asked the VE to consider the individual of the same age, educational background and vocational history as Plaintiff. (R. at 71.) The individual must sit, stand or walk for one hour at a time at the most, and must be able to alternate between standing and sitting at will. (R. at 71.) The individual could lift no weight at all. (R. at 71.) The individual could not repeatedly lift, handle, finger, or lift, and would be markedly limited in her ability to grasp, turn or twist objects, use her fingers for fine manipulation or reach in any direction, including overhead. (R. at 71.) Again, the VE testified that such an individual could not engage in Plaintiff's prior work, nor could they find any employment in the national or local economy. (R. at 71-72.)

Finally, the ALJ posed a hypothetical question in which the individual could occasionally lift or pull up to twenty pounds, could frequently lift or pull up to ten pounds and could stand, walk and/or sit for approximately six hours during a normal workday — provided she could alternate between sitting and standing at will. (R. at 72.) This individual could occasionally climb ramps and stairs, could balance, stoop and crouch, and could frequently use her hands to grasp or finger. (R. at 72-73.) The individual could not climb ropes, ladder or scaffolds, could not kneel and/or crawl, or use her left arm to reach overhead. (R. at 72-73.)

The VE testified that this individual could not perform Plaintiff's past work. (R. at 73.) However, the VE testified that other work existed in the local or national economy that this individual could perform, including: a mail clerk with more than 2,600 positions in Virginia and over 70,000 nationwide; a counter clerk with more than 1,100 positions in Virginia and over

52,000 nationwide; and as a parking lot attendant with more than 800 positions in Virginia and over 66,000 nationwide. (R. at 73-74.)

Plaintiff's attorney then cross-examined the VE. (R. at 75.) The VE testified that no more than one absence per month could be tolerated in a competitive work environment. (R. at 76.) The VE testified that, if the hypothetical individual could lift only five pounds occasionally, she could still work as a parking attendant. (R. at 75-76). If the person was limited to only occasional grasping, turning and twisting of objects, none of the previously suggested positions would be suitable, and the individual could find no work in the national economy. (R. at 75-76.)

## II. PROCEDURAL HISTORY

On June 18, 2012, Plaintiff applied for DIB and SSI, alleging disability due to thyroid cancer, diabetes mellitus, frozen shoulder syndrome and hypocalcemia, with an alleged onset date of December 20, 2011. (R. at 21, 234-35, 247-53, 280.) Her applications were initially denied on January 17, 2013, and upon reconsideration on May 3, 2013. (R. at 21.) On June 4, 2013, Plaintiff filed a written request for a hearing. (R. at 21.) On August 26, 2014, the ALJ held a hearing during which Plaintiff and an impartial VE testified. (R. at 21.) On September 26, 2014, the ALJ issued a decision finding that Plaintiff was not disabled. (R. at 21-29.) Plaintiff requested that the Appeals Council review the ALJ's decision. (R. at 15.) On December 10, 2014, the Appeals Council denied Plaintiff's request, finding no basis to review the ALJ's decision. (R. at 1-4.)

## III. QUESTIONS PRESENTED

1. Did the ALJ fail to properly weigh the medical evidence?

2. Did the ALJ err in assessing Plaintiff's credibility?

3. Did the ALJ err in determining Plaintiff's RFC?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla but less than a preponderance, and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine that substantial evidence exists, the Court must examine the entire record, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that

15

process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 416.920(b), 404.1520(b). SGA consists of both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities . . . [Work] may be substantial even if it is done on a part-time basis" or if the worker does less, is paid less or enjoys less responsibility than when previously employed. 20 C.F.R. § 404.1572(a). Gainful work activity is done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance and the like are generally not considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled" regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is

expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[2] based on an assessment of the claimant's residual functional capacity ("RFC")[3] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146, n.5 (1987)). The Commissioner can carry her burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that

---

[2]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[3]    RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, eight hours a day, five days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity that the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

A. The ALJ's Decision

On August 26, 2014, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 21, 36-77.) On September 26, 2014, the ALJ rendered her decision in a written opinion, finding that Plaintiff was not disabled under the Social Security Act ("Act"). (R. at 21-29.)

The ALJ followed the five-step sequential evaluation process in determining whether Plaintiff was disabled. (R. at 21-29); *see also* 20 C.F.R. § 404.1520(a). First, the ALJ determined that the Plaintiff had not engaged in SGA since her alleged onset date of December 20, 2011. (R. at 23.) At step two, the ALJ determined that Plaintiff suffered from the severe impairments of fibromyalgia, degenerative disc disease, left shoulder degenerative joint disease and obesity. (R. at 23.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24; *see also* 20 C.F.R. §§ 404.1520(d), 404.1526.) The ALJ further found that Plaintiff had the RFC to perform light work with certain limitations. (R. at 24.) At step four, the ALJ found that Plaintiff could not

18

perform any of her past relevant work. (R. at 28.) At step five, the ALJ found, based upon VE

testimony and considering Plaintiff's age, education, work experience and RFC, that jobs existed

in significant numbers in the national economy that Plaintiff could perform. (R. at 28.)

Accordingly, the ALJ found that Plaintiff was not disabled under the Act. (R. at 28-29.)

Plaintiff challenges the ALJ's decision, arguing that the ALJ failed to properly weigh the

medical evidence in the case and incorrectly assessed Plaintiff's credibility, and as a result erred

in determining Plaintiff's RFC. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF

No. 11) at 12, 18.)

B. Substantial evidence supports a finding that the ALJ properly weighed the medical
evidence in this case.

Plaintiff argues that the ALJ erred by affording less than controlling weight to Dr. Rose's

and Dr. Minter's opinions. (Pl.'s Mem. at 12-18.) Defendant maintains that substantial evidence

supports the ALJ's decision. (Def.'s Mot. for Summ. J. and Mem. in Supp. ("Def.'s Mem.")

(ECF No. 12) at 13-18.)

During the sequential analysis, when the ALJ determines whether the claimant has a

medically-determinable severe impairment or combination of impairments that would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided, as well as any medical evidence

resulting from consultative examinations or medical expert evaluations that have been ordered.

20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions,

including those from Plaintiff's treating physician, consultative examiners or other sources that

are consistent with each other, then the ALJ makes a determination based on that evidence. 20

C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each

other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved.  20 C.F.R. §§ 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p.  Further, the regulations do not require that the ALJ accept opinions from a treating physician in every instance, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the commissioner), or when the physician's opinion is inconsistent with other evidence or when it is not otherwise well-supported.  20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

The ALJ must consider the following when evaluating a treating physician's opinions: (1) the length of the treating physician relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating physician; and (6) any other relevant factors.  20 C.F.R. § 404.1527(d)(2)-(6).  However, those same regulations specifically vest the ALJ – not the treating physician – with authority to determine whether the claimant is disabled as the term is defined by statute.  20 C.F.R. § 404.1527(e)(1).

In this case, Dr. Minter noted on May 12, 2012, that Plaintiff could lift and/or carry up to five pounds occasionally, had "marked" grasping and reaching limitations on the left side (with no such limitation on the right) and that Plaintiff could not push or pull anything.  (R. at 730-35.) Despite these indications of disabling functional limitations, the ALJ properly afforded little weight to Dr. Minter's assessment.

Dr. Minter's own treatment records indicate that Plaintiff would not continue to remain in a debilitated state. Indeed, his treatment notes show improvement in Plaintiff's affected shoulder following her surgeries in December of 2011 and February of 2012. (R. at 499, 530.) Dr. Minter noted that Plaintiff made "okay" progress in March of 2012. (R. at 920.) In notes written through July of 2012, Dr. Minter noted continued shoulder improvement in terms of mobility. (R. at 917-919.) Furthermore, although Dr. Minter opined that Plaintiff could lift no more than five pounds, no objective evidence of muscle weakness, atrophy or deficit exists in his treatment notes to substantiate his assessment.

Dr. Rose's opinion that Plaintiff suffered from fibromyalgia is likewise unsubstantiated. Although Dr. Rose stated on a questionnaire that Plaintiff suffers from fibromyalgia, no treatment notes document any testing for the condition. (R. at 1208.) Additionally, Dr. Rose did not document any attempts to ameliorate the condition besides medication. Dr. Rose never recommended alternate treatment options.[4]

Furthermore, Dr. Rose's notes fail to document any finding of musculoskeletal tenderness, positive fibromyalgia tender points, neurological abnormalities or loss of strength. (R. at 1115, 1155, 1164, 1253.) Simply put, Dr. Rose's own treatment notes do not support his assessment that Plaintiff suffered from fibromyalgia. Indeed, Dr. Rose did not diagnose fibromyalgia based on a physical examination, but instead on Plaintiff's medical records during her initial evaluation on October 9, 2012. (R. at 1114.)

Dr. Minter and Dr. Rose both indicated that Plaintiff struggled with grasping and manipulating objects. (R. at 732, 1200-1201.) Plaintiff's own testimony and function reports

---

[4]    Treatment options for fibromyalgia include rheumatology consultation, pain management or physical therapy. *Fibromyalgia*, THE UNIVERSITY OF MICHIGAN HEALTH SYSTEM (Apr. 16, 2015), http://www.uofmhealth.org/health-library/hw196365.

directly contradict these opinions. (R. at 55, 57, 309.) Plaintiff stated that she was able to

crochet for multiple hours per day and cook meals for herself. (R. at 57, 309, 337.) On August

26, 2012, she testified to that effect during her hearing. (R. at 43-68.) Plaintiff could also tend to

personal care needs, vacuum, and sweep, do laundry, clean, and drive an automobile. (R. at 307-

310.) The ALJ concluded that Plaintiff's self-reported daily activities undermined the opinions

of Dr. Minter and Dr. Rose by demonstrating a significantly greater physical functional ability

than allowed for in their diagnoses. (R. at 27.) Therefore, substantial evidence supports the

ALJ's determination to afford less than controlling weight to the opinions of Drs. Minter and

Rose.

      C.   The ALJ did not err in assessing Plaintiff's credibility.

      Plaintiff argues that substantial evidence fails to support the ALJ's determination

regarding Plaintiff's credibility. (Pl.'s Mem. at 18.) Defendant responds that substantial

evidence supports the ALJ's credibility assessment. (Def.'s Mem. at 18.)

      The determination of witness credibility by the ALJ consists of a two-step process.

*Craig*, 76 F.3d at 585. First, the Plaintiff must provide objective medical evidence which

demonstrates the existence of a medical impairment that could be reasonably expected to

produce the Plaintiff's alleged symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b). Second, the

ALJ is tasked with evaluating the intensity, persistence and limiting effects of the symptoms in

an effort to determine the extent to which the symptoms limit Plaintiff's ability to do basic work

activities. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c). The ALJ must consider all of the medical

evidence in the record when making this determination. *Craig*, 76 F.3d at 594-95; SSR 96-7p at

5, n.3; *see also* SSR 96-8p at 13 (the ALJ's "RFC assessment must be based on all of the

relevant evidence in the case record"). "All available evidence" in this context includes a finding

of the credibility of the claimant's statements regarding the extent of the alleged symptoms, and the ALJ must provide specific justification for the weight afforded to the claimant's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11. The ALJ may consider the effectiveness of medications used to alleviate symptoms. 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv). The ALJ must consider a claimant's reported daily activities when assessing credibility. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i).

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v Air Prods. & Chems., Inc.*, 717 F.2d 141 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's findings of fact and determinations of credibility unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *N.L.R.B. v McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well-established that a claimant's subjective allegations of pain alone are not conclusive evidence that the claimant is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

In this case, the ALJ concluded that based on the evidence in the record, Plaintiff's established impairments could be reasonably expected to produce her alleged symptoms. (R. at 25.) However, the ALJ further determined that Plaintiff's statements concerning the "intensity,

23

persistence and limiting effects" of her alleged symptoms were "not entirely credible" based

upon the overall record of objective medical findings and inconsistencies within Plaintiff's

statements. (R. at 25-27.) Substantial evidence supports the ALJ's credibility determination.

The relatively limited and conservative nature of Plaintiff's treatment supports the ALJ's

credibility assessment. (R. at 27.) Further, Plaintiff's physical examinations failed to produce

the type of objective findings that would substantiate her alleged functional limitation. (R. at

27.) And, clinical notes from multiple examinations showed no significant loss of strength, no

neurological abnormalities, no positive fibromyalgia tender points and no ongoing

musculoskeletal tenderness. (R. at 1115, 1145, 1155, 1245, 1253.) After having her medications

adjusted in early 2013, Plaintiff reported an improvement in her condition, repeatedly stating that

she felt well and experienced no unusual musculoskeletal symptoms later that year. (R. at 1164,

1185.) On January 7, 2014, Plaintiff complained of increased fibromyalgia pain, yet Plaintiff's

treating physician did not increase treatment frequency, nor did he refer Plaintiff to pain

management specialists. (R. at 1253-54.) Additionally, the state agency physicians opined that

Plaintiff's complaints and alleged symptoms were likely not as severe as Plaintiff claimed. (R. at

114, 117.)

Plaintiff's statements and function reports further undermine her credibility. Plaintiff

acknowledged that she could prepare meals for herself, tend to personal care needs, vacuum,

sweep, launder clothing, drive an automobile, shop, manage finances and count money, socialize

with others and crochet. (R. at 51-57, 59, 307-11.) These activities belie Plaintiff's assertion

that she was incapable of performing any work functions, such as sitting and/or standing for a

prolonged period of time or manipulating objects with her hands. (R. at 71, 732, 1199-1201.)

Therefore, substantial evidence supports the ALJ's credibility assessment.

D. The ALJ did not err in determining Plaintiff's RFC.

Plaintiff argues that the ALJ failed to properly determine Plaintiff's RFC. (Pl.'s Mem. at 16-18.) Defendant maintains that the ALJ properly determined Plaintiff's RFC. (Def.'s Mem. at 12-17.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine Plaintiff's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. The final responsibility for determining RFC is reserved for the Commissioner, who will not give any special significance to another opinion on the issue. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Similarly, the issue is reserved for the ALJ at the hearing phase, and the ALJ need not seek a separate medical opinion on the issue. 20 C.F.R. §§ 404.1546, 416.946.

In this case, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that Plaintiff should only occasionally climb ramps and stairs, balance, stoop, kneel and crouch, but Plaintiff should never climb ropes, ladders and scaffolds. (R. at 24.) Plaintiff should also never crawl. (R. at 24.) Plaintiff could not reach overhead with her left (non-dominant) arm. (R. at 24.) Plaintiff could frequently finger, handle and grasp, and Plaintiff must be able to alternate between sitting and standing in place every thirty minutes. Due to pain, Plaintiff could only perform unskilled level work. Substantial evidence exists to support the ALJ's determination of Plaintiff's RFC.

Dr. Wickham's and Dr. Kadian's opinions are consistent with the ALJ's RFC determination. According to Dr. Wickham and Dr. Kadian, Plaintiff exhibited exertional and

25

postural limitations. (R. at 86-88.) Plaintiff could lift up to twenty pounds occasionally and only up to ten pounds frequently. (R. at 87.) Plaintiff could only sit or stand for a total of six hours in an eight-hour workday. (R. at 87.) Plaintiff could climb ramps/stairs, balance, stoop, kneel, crouch and crawl with unlimited frequency. (R. at 87.) Plaintiff's only physical limitations involved the use of her left shoulder. (R. at 88.) For this reason, Dr. Wickham declared that Plaintiff should be limited to light work when re-entering the workforce. (R. at 89.)

Although this assessment contradicts the opinions of Dr. Rose and Dr. Minter, it is consistent with Plaintiff's stated activities. In her testimony and function reports, Plaintiff acknowledged the ability to prepare meals for herself, tend to personal care needs, vacuum, sweep, launder clothing, drive an automobile, shop, manage finances and count money, socialize with others and crochet. (R. a 51-57, 59, 307-11.) These activities clearly indicate that she could accomplish some work-related tasks, albeit at a lower level than she could before the onset of her conditions. As such, there is substantial evidence in the record to support the ALJ's determination of Plaintiff's RFC.

## VI. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED; that Plaintiff's Motion for Remand (ECF No. 10) be DENIED; that the Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in this report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____/s/_____

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: _November 9, 2015_